THOMAS MICHAEL LARRY,              )
                                   )
                Petitioner,        )
                                   )
          v.                       )        1:05CV00628
                                   )
MARVIN POLK, Warden,               )
Central Prison,                    )
                                   )
                Respondent.        )


### ORDER AND RECOMMENDATION OF MAGISTRATE JUDGE ELIASON

Thomas Michael Larry ("petitioner"), a prisoner of the State of North Carolina, seeks relief pursuant to 28 U.S.C. § 2254. Petitioner was indicted in Forsyth County, North Carolina, on August 1, 1994 for first-degree murder and robbery with a dangerous weapon. On April 25, 1995, petitioner was convicted after trial by jury of both offenses; the first-degree murder conviction was based on premeditation and deliberation, and the felony murder rule. Following the capital sentencing proceeding held pursuant to N.C. Gen. Stat. § 15A-2000, the jury recommended that petitioner be sentenced to death. On April 28, 1995, the Honorable Judson D. DeRamus, Jr. sentenced petitioner to death for the first-degree murder conviction and to a consecutive term of forty-years imprisonment for the armed robbery conviction. Petitioner was represented at trial by Attorneys George Russell Clary and Elizabeth Horton. The prosecution was represented by Forsyth County Assistant District Attorneys Eric A. Saunders and David Spence.

The North Carolina Supreme Court affirmed petitioner's conviction and sentence on March 7, 1997. State v. Larry, 345 N.C. 497, 481 S.E.2d 907 (1997). The United States Supreme Court denied certiorari review on October 14, 1997. Larry v. North Carolina, 522 U.S. 917, 118 S.Ct. 304 (1997). Petitioner was represented by Attorney Mark D. Montgomery, Assistant Appellate Defender, on direct appeal.

Petitioner filed a motion for appropriate relief ("MAR") in the Superior Court of Forsyth County on June 1, 1998, and amended the MAR on February 9, 1999. On January 30, 2002, while his MAR was still pending, petitioner filed a motion pursuant to N.C. Gen. Stat. § 15A-2005 alleging mental retardation. The Honorable James M. Webb denied petitioner's MAR on April 24, 2001 and the North Carolina Supreme Court denied certiorari review on June 27, 2002. State v. Larry, 355 N.C. 755, 566 S.E.2d 84 (2002). The Honorable Ronald E. Spivey conducted an evidentiary hearing concerning petitioner's mental retardation claim and denied the motion on July 3, 2003. The North Carolina Supreme Court again denied certiorari review on March 4, 2005.[1] State v. Larry, 359 N.C. 324, 611 S.E.2d 841 (2005). Petitioner was represented by Attorneys William G. Causey, Jr. and Mark L. Killian on state collateral review. Present counsel, Attorneys Gretchen M. Engel and Elizabeth

---

[1] The published date for this denial of certiorari review, which ended the tolling of the one-year statute of limitations period, is March 3, 2005. Petitioner relies on the date of March 4 based on when the order was "certified" by the clerk of court, which is not contested by the State. This seemingly trivial distinction could have had critical statute of limitations implications. See infra note 2.

Hambourger of the Center for Death Penalty Litigation, Inc. (the "Death Penalty Center"), assumed representation on March 31, 2005.

Petitioner filed his petition for a writ of habeas corpus in this Court on July 18, 2005.[2] (Docket No. 8). Petitioner's habeas filing included two documents labeled "petition," one of which was in fact a seventy-five page document consisting of case citations and legal arguments. After conducting a telephonic conference, this Court ordered that the seventy-five page document constituted petitioner's brief and allowed supplemental briefing of no more than twelve pages. (Docket No. 13). Also on July 18, 2005, petitioner filed a second MAR, a motion for an evidentiary hearing, and a motion to reopen litigation of his mental retardation claim in the Superior Court of Forsyth County, as well as a motion to hold his federal habeas proceeding in abeyance pending the outcome of the state motions. This Court denied the abeyance motion on July 25, 2005. (Docket No. 6). On September 12, 2005, the State filed its answer to the habeas petition and a motion to dismiss

---

[2] Petitioner filed his federal habeas petition on the last day of the one-year statute of limitations period, as calculated using the March 4, 2005 date. Waiting until the eleventh hour to file a capital habeas petition is an unnecessarily risky litigation tactic; a simple miscalculation could produce the unintended consequence of denying federal habeas review and ultimately hastening, rather than lengthening, the carrying-out of the sentence. See Rouse v. Lee, 339 F.3d 238 (4th Cir. 2003) (affirming the dismissal of a habeas petition that was filed one day late because of a "slight miscalculation"). Given the result in Rouse and the Death Penalty Center's participation in that case, it is beyond comprehension why the petition in this case was filed with essentially no time to spare. This is especially true considering the potential ambiguity concerning the actual filing deadline. See supra note 1. Unfortunately, contrary to the dissent's hope, fears that lawyers will unnecessarily jeopardize their clients' rights by last minute filings has not turned out to be baseless. Id. at 265 (Motz, J., dissenting).

-3-

certain claims for non-exhaustion. (Docket Nos. 15, 16). On October 5, 2005, petitioner filed a motion to expand the record (Docket No. 22) and a renewed motion to either hold this proceeding in abeyance or, in the alternative, dismiss all unexhausted claims to be in compliance with the "total exhaustion" rule of Rose v. Lundy, 455 U.S. 509, 102 S.Ct. 1198 (1982) (Docket No. 19). On December 28, 2005, this Court again denied petitioner's abeyance motion and dismissed all unexhausted claims. (Docket No. 38). The parties have now completed their briefing schedules and the petition is ready for a ruling.

## I.   FACTS

The facts, as shown by the evidence presented at petitioner's trial, are summarized below.

### A.   Guilt Phase

The North Carolina Supreme Court, in its opinion denying petitioner's direct appeal, set out the facts of the guilt phase of trial as follows:

> The evidence at trial tended to show that on 15 January 1994, at approximately 9:30 p.m., defendant robbed a Food Lion grocery store in Winston-Salem. Cynthia Pennell, a Food Lion employee who had access to the safe, saw defendant standing in the front part of the store and asked if she could help him. He said that she could open the safe for him and that if she did not, she was a dead woman. He pointed a small black revolver at her. Pennell went to the safe and opened it. Defendant took at least $1,700 from the safe and put it in a box. He put the box under his arm and went outside. Throughout the robbery, he pointed the gun at others in the store, telling them not to move.

> The murder victim, Robert Buitrago, an off-duty police officer, was a customer waiting in line at a register when the robbery occurred. One witness, Chastity Adams,

-4-

saw defendant point the gun at Buitrago and say, "If you move, you're dead." The cashier for Buitrago's line had her back to defendant but heard him say, "Don't move or I'll kill you." Defendant ran from the store, and Buitrago chased him. When Buitrago caught up with defendant outside the store, near the front doors, a struggle ensued, and defendant fatally shot Buitrago with the handgun. Some witnesses said there was one shot, and some said there were two or more shots. Buitrago died from a single gunshot wound to the chest. Defendant fled on foot.

After witnesses identified defendant as the perpetrator, police obtained arrest warrants and subsequently found defendant hiding in a residence in Winston-Salem. Patrick Huey of the Forsyth County Sheriff's Department testified that he overheard defendant making a statement during a phone conversation from the Forsyth County jail, after his arrest. Huey testified that defendant told the person on the other end that "when they were brought in that they would be kept separate inside the jail and for them not to tell them anything, that he wasn't going to, and that they would not find the weapon; that he was the only one [who] knew where it was."

Larry, 345 N.C. at 507-08; 481 S.E.2d at 913.

In addition to the testimony of Cynthia Pennell and Chastity Adams, discussed above, eight other prosecution witnesses testified concerning the grocery store robbery, including: Devae Crockett; Lou Blevins; Claudia Wilson; David Hutchins; Demario Mills; Cathy Peterson; David Marion; and Sherri Sapp. (Trial Tr. at 673-818). Seven of those witnesses saw Officer Buitrago pursue the robber and five positively identified petitioner as the robber. Another witness, Sharnette Smith, testified that she saw petitioner and Officer Buitrago exit the grocery store and that petitioner pointed a gun at her. (Id. at 819-27). Marion and Sapp further testified that they saw, while looking out of the grocery store window, petitioner and Officer Buitrago struggling in the parking lot and

-5-

running in different directions following the fired shot(s). (<u>Id</u>.
at 782-818, 815-17, 827-30). They both witnessed the gun in
petitioner's hand during the struggle and Sapp saw petitioner point
the gun at Officer Buitrago's chest. (<u>Id</u>. at 792, 812-14).
Finally, Joan Towner testified that, two nights prior to the Food
Lion robbery in Winston-Salem, petitioner robbed her at gunpoint in
the Durham grocery store where she worked. (<u>Id</u>. at 949-57). The
defense presented no evidence at the guilt phase of trial.

### B.   Sentencing Phase

The North Carolina Supreme Court summarized the facts of the
sentencing phase of trial as follows:

> At the sentencing proceeding, the State presented
> evidence that defendant previously had been convicted
> once for common law robbery and three times for armed
> robbery. The jury found as four separate aggravating
> circumstances that defendant previously had been
> convicted of a violent felony. The jury also found as an
> aggravating circumstance that the murder was committed
> while defendant was engaged in the commission of a
> robbery. The jury found the statutory mitigating
> circumstances that the murder was committed while
> defendant was mentally or emotionally disturbed and that
> defendant's capacity to appreciate the criminality of his
> conduct or to conform his conduct to the requirements of
> the law was impaired. The jury also found five
> nonstatutory mitigating circumstances as well as the
> catchall mitigating circumstance. However, the jury
> recommended a sentence of death. The court sentenced
> defendant to death for the first-degree murder conviction
> and to a consecutive term of forty years' imprisonment
> for the armed robbery conviction.

<u>Larry</u>, 345 N.C. at 508; 481 S.E.2d at 913-14.

The defense presented four witnesses during the sentencing
phase of trial. Brenda Manley, a supervisor of inmate services for
the Forsyth County Sheriff's Department, testified that petitioner

-6-

had no disciplinary issues while previously incarcerated. (Trial Tr. at 1094-96). Gary Hoover, a psychologist, testified that petitioner has adult antisocial personality disorder, which reduces his ability to conform with social norms. (Id. at 1108-27). James Larry, petitioner's brother, testified about their family history and being reared by a single mother. (Id. at 1155-58). Finally, petitioner testified that he was sorry for the harm he caused, that he did not intend to physically harm anyone, and that he was unaware that Robert Buitrago was a police officer. (Id. at 1168-73, 1201).

## II. PETITIONER'S CLAIMS

Petitioner has raised the following claims for relief in his habeas petition:[3]

I. The state trial court violated petitioner's rights to due process and a reliable sentencing determination by failing to instruct the jury on the lesser-included offense of second-degree murder ("*BECK* CLAIM").

II. The execution of petitioner, a person with mental retardation, would constitute cruel and unusual punishment in violation of the Eight Amendment process ("*ATKINS* CLAIM").

. . .

VI. Petitioner's right to effective assistance of counsel and a reliable sentencing hearing were violated when trial counsel insulted the jury in closing argument at the penalty phase ("IAC CLOSING ARGUMENT CLAIM").

. . .

VIII. Petitioner's rights to due process and a reliable sentencing determination were violated by the trial

---

[3] Claims III, IV, V, VII, IX, X, XV, and XVI were dismissed as unexhausted and, therefore, will not be discussed herein.

court's erroneous instruction requiring unanimity for rejection of the death penalty (*McKOY/LOWENFIELD* CLAIM").

. . .

XI. Petitioner's rights to due process and a reliable sentencing determination were violated by the prosecutor's improper and prejudicial remarks to the jury concerning petitioner's character and speculation about his possibility of release ("*BERGER* CLAIM").

XII. Petitioner's rights to due process and a reliable sentencing determination were violated by the jury's consideration of evidence outside the record weighing in favor of death ("PAROLE CLAIM").

XIII. Petitioner's rights to due process and a reliable sentencing determination were violated by the prosecutor's improper and prejudicial remarks to the jury concerning petitioner's exercise of his constitutional rights ("*GRIFFIN/PEARCE* CLAIM").

XIV. Petitioner's rights to due process and a reliable sentencing determination were violated by the failure of the jury to find non-statutory mitigating circumstances that petitioner was reared by a single mother after his father abandoned the family and that he suffers from a mental disturbance which is genetic in origin ("*TENNARD* CLAIM").

. . .

(Docket No. 8, Habeas Pet./Br. at 10-16, 49-50, 52-54, 58-68).

## III. STANDARDS OF REVIEW

If the Court finds that petitioner's claims were adjudicated by the state courts on their merits, it must then apply the highly deferential standard of review set forth in 28 U.S.C. § 2254(d), part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Section 2254(d) states that habeas relief cannot be granted in cases where a state court has considered a claim on its merits unless the decision was contrary to or involved an unreasonable application of clearly established federal law as set

-8-

out by the United States Supreme Court or that the state court decision was based on an unreasonable determination of the facts. A state court decision is "contrary to" Supreme Court precedent if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. <u>Williams v. Taylor</u>, 529 U.S. 362, 405, 120 S.Ct. 1495, 1519 (2000). A state decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id</u>. at 407, 120 S.Ct. at 1520. "Unreasonable" is not the same as "incorrect" or "erroneous" and the reasonableness of the state court's decision must be judged from an objective, rather than subjective, standpoint. <u>Id</u>. at 409-10; 120 S.Ct. at 1521-1522. A holding is not reasonable simply because precedent written by one of the Nation's jurists agrees with it. <u>Id</u>. As for questions of fact, state court findings of fact are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV. DISCUSSION OF PETITIONER'S CLAIMS

Petitioner raised sixteen claims for relief in his habeas petition/brief, eight of which were dismissed as unexhausted. In addition to seeking relief on the remaining eight claims, petitioner has also requested an evidentiary hearing on several

-9-

claims.  For the reasons discussed below, however, the Court is able to decide the case based solely on the record without further supplementation.

### A.  Claim I

Petitioner contends in Claim I that the trial court violated his rights to due process and a reliable sentencing determination by failing to instruct the jury on the lesser-included offense of second-degree murder.  Petitioner argues that there was sufficient evidence to rebut or call into question a finding of premeditation and deliberation and require a second-degree murder jury instruction.  This claim was considered and denied by the North Carolina Supreme Court on direct appeal.  Larry, 345 N.C. at 518; 481 S.E.2d at 919.

The United States Supreme Court has held that a capital defendant has the due process right to receive a lesser-included offense jury instruction "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense - but leaves some doubt with respect to an element that would justify conviction of a capital offense . . . ."  Beck v. Alabama, 447 U.S. 625, 637-38, 100 S.Ct. 2382, 2389 (1980).  "But '[a] defendant is not entitled to have the jury instructed as to lesser degrees of the crime simply because the crime charged is murder.'"  Bates v. Lee, 308 F.3d 411, 418 (4th Cir. 2002) (quoting Briley v. Bass, 742 F.2d 155, 164 (4th Cir. 1984)).  Rather, "due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction."  Hopper

Case 1:05-cv-00628-WO-LPA   Document 39   Filed 06/13/06   Page 10 of 51

v. Evans, 456 U.S. 605, 611, 102 S.Ct. 2049, 2053 (1982) (emphasis in original). The focus, therefore, is on whether there is sufficient evidence to support a lesser-included offense, not on whether "the evidence is sufficient to prove the greater one." See Hooks v. Ward, 184 F.3d 1206, 1232 (10th Cir. 1999).[4]

"'The decision of whether there is enough evidence to justify a lesser included offense charge rests within the sound discretion of the trial judge.'" Bates, 308 F.3d at 418 (quoting United States v. Chapman, 615 F.2d 1294 (10th Cir. 1980)). Furthermore, "'[w]here . . . the highest court of a state has reviewed a defendant's request for a lesser included offense instruction and concluded that it is not warranted by the evidence elicited at trial, that conclusion is axiomatically correct, as a matter of state law. Accordingly, the circumstances that induce a federal court to overturn the state court determination would need to be extraordinary, indeed.'" Id. (quoting Bagby v. Sowders, 894 F.2d 792, 795 (6th Cir. 1990)).

There are three degrees of homicide under North Carolina law, only two of which are relevant to this case. First-degree murder

_____

[4]    The North Carolina rule, which is consistent with the federal constitutional rule, is as follows:

A defendant is entitled to have "a lesser-included offense submitted to the jury only when there is evidence to support that lesser-included offense." State v. Flowers, 347 N.C. 1, 29, 489 S.E.2d 391, 407 (1997). When the State's evidence establishes "each and every element of first-degree murder and there is no evidence to negate these elements, it is proper for the trial court to exclude second-degree murder from the jury's consideration." Id.

State v. Thibodeaux, 352 N.C. 570, 582, 532 S.E.2d 797, 806 (2000).

-11-

is the "unlawful killing of another human being with malice and with premeditation and deliberation." State v. Bonney, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991); N.C. Gen. Stat. § 14-17. Second-degree murder is "the unlawful killing of another human being with malice but without premeditation and deliberation." Thibodeaux, 352 N.C. at 582, 532 S.E.2d at 806. "Premeditation means that the act was thought out beforehand for some period of time, however short, but no particular amount of time is necessary for the mental process of premeditation." State v. Connor, 335 N.C. 618, 635, 440 S.E.2d 826, 835-36 (1994). "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose, and not under the influence of a violent passion, suddenly aroused by a lawful or just cause of provocation." Id. at 635, 440 S.E.2d at 836.

Following the close of evidence in this case, the trial court excused the jury and conducted a charge conference. The court noted its initial intention to give only first-degree murder jury instructions, stating that "there's no evidence that tends to show second degree murder." (Trial Tr. at 964). Petitioner's trial counsel objected to the court's characterization of the evidence and requested a second-degree murder instruction. (Id. at 965). The prosecution agreed with the court that there was sufficient evidence to support a first-degree murder instruction, but noted that a second-degree instruction was probably warranted "out of an abundance of precaution." (Id. at 967). The prosecution believed

that a jury could find that petitioner was surprised by Officer Buitrago "[a]nd based on that, . . . could find that he didn't actually premeditate the murder or deliberate upon the murder, just fired instinctively." (Id. at 967). Despite the prosecution's concurrence with petitioner's position, the court found no evidence to support a verdict less than first-degree murder and ruled "that an instruction on second degree should not be submitted." (Id. at 972-73).

Petitioner contends that the trial court was in error and that a second-degree murder jury instruction was mandated in this case based on the testimony presented during the guilt phase of trial and all reasonable inferences drawn therefrom. In support of his contention, petitioner argues: (1) that he left the grocery store following the robbery (and now asserts without intending to physically harm anyone); (2) that he did not physically harm anyone in the previous armed robbery introduced into evidence (although petitioner omits showing whether anyone tried to stop him); (3) that Officer Buitrago ran after and attacked him and that one witness speculated that this surprised petitioner; (4) that the shooting occurred in a short time, during a struggle; (5) that although some witnesses reported multiple shots, Officer Buitrago suffered a single gun shot wound and that no other bullets were found at the scene; and (6) that he was trying to get away from

Officer Buitrago (and now asserts did not intend to kill him). (Docket No. 33, Pet'r Reply Br. at 4-5).[5]

Petitioner raised this claim on direct appeal. The North Carolina Supreme Court outlined the correct governing legal standard and found that "the trial court did not err in declining to submit the lesser included offense[]" of second-degree murder. Larry, 345 N.C. at 518, 481 S.E.2d at 919. Petitioner contends that the court unreasonably applied Beck and Hopper by basing its decision on whether there was sufficient evidence of first-degree murder rather than on whether there was any evidence of second-degree murder. This is not correct.

In support of this contention, petitioner concedes that the court found "'positive' evidence supporting each and every element of first degree murder." (Docket No. 33, Pet'r Reply Br. at 2). What petitioner omits to acknowledge is that in addition, the court

_____

[5] Petitioner also argues in his brief/petition that he intended only to brandish the gun during the robbery, that he was unaware that the gun was loaded, that he had not harmed anyone in several previous robberies, and that he fled under the reasonable belief that Officer Buitrago was not mortally wounded. (Docket No. 8, Hab. Pet./Br. at 10-14). Petitioner did not present any evidence during the guilt phase of trial and this information was not before the trial court when the jury instruction decision was made. Therefore, it is irrelevant.
Respondent notes that unlike other portions of the petition/brief and reply brief, citations to the record are conspicuously absent when referring to information learned solely during the sentencing phase of trial. It is suggested petitioner may have been attempting to mislead the Court. Petitioner denies any intentional misrepresentation and contends that the evidence first presented during the sentencing phase of trial was included only to corroborate evidence presented during the guilt phase. (Docket No. 33, Pet'r Reply Br. at 3). First, the argument amounts to a non sequitur. The sentencing testimony could not corroborate the trial testimony at the guilt phase for purposes of determining whether petitioner received a fair trial for the guilt phase. Second, although this evidence should not have even been cited, since it was, counsel had a duty to make clear it came from the sentencing phase. The failure to do so allows aspersions to be unnecessarily cast on petitioner's counsel's integrity.

-14-

also clearly states that such positive evidence is "uncontradicted" and "uncontroverted." Larry, 345 N.C. at 518, 481 S.E.2d at 919. The use of the words "uncontradicted" and "uncontroverted" shows that the court properly considered whether there was evidence of second-degree murder and concluded that no evidence was presented that was either contrary to or disputed a finding of first-degree murder (i.e., evidence did not refute or call into question a finding of premeditation and deliberation).[6]

Petitioner further contends that the state courts misapplied state law by finding that no evidence was presented at trial to warrant a second-degree murder instruction. A challenge to a state court determination of its own substantive state law, however, is not cognizable on habeas review; "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480 (1991); Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (stating that federal habeas review is limited to "violations

---

[6]  The uncontradicted evidence presented during the guilt phase of trial showed that petitioner: (1) continuously brandished a handgun during the robbery, (2) pointed the gun directly at store employees and patrons, (3) threatened to kill anyone who failed to comply with his demands, (4) in particular, threatened to kill Buitrago, (5) possessed the gun during the ensuing struggle with Officer Buitrago, (6) pointed the gun directly at Officer Buitrago's chest before firing the fatal shot, and (7) after shooting Buitrago, immediately fled rather than hesitating to check on Buitrago.
    The evidence clearly shows that petitioner from the start intended to kill anyone who interfered with his robbery and specifically, Buitrago. Petitioner now wants to talk about his intentions and whether he was surprised. However, there was no evidence of this presented at trial and the evidence of him being surprised was rank speculation of a witness. The actual evidence only showed that petitioner at all times intended to kill anyone who tried to stop him and did so.

of the United States Constitution or its laws and treaties");
Kornahrens v. Evatt, 66 F.3d 1350, 1357 (4th Cir. 1995) ("[B]asic
principles of federalism permit us to review only those state-court
decisions that implicate federal constitutional rights.").
Therefore, the North Carolina Supreme Court's denial of this claim
was neither contrary to, nor an unreasonable application of,
established Supreme Court precedent (i.e., Beck and Hopper).
Accordingly, Claim I should be denied.

**B.  Claim II**

In Claim II, petitioner contends that he is mentally retarded
and that his execution would constitute cruel and unusual
punishment in violation of the Eighth Amendment.  Petitioner raised
this claim on state collateral review and the state court denied
relief after conducting an evidentiary hearing.  (Docket No. 27,
Resp't Br., Attach. 4, Mental Retardation Order at 19).  Petitioner
now seeks to expand the record to include subsequent testing and
testimony in support of this claim.  (Docket No. 22).

In Atkins v. Virginia, the United States Supreme Court held
that the Eighth Amendment prohibits the execution of mentally
retarded persons.  536 U.S. 304, 321, 122 S.Ct. 2242, 2252 (2002).
The Supreme Court, however, left to the states the task of
developing appropriate procedures to determine the existence of
mental retardation.  Id. at 317, 122 S.Ct. at 2250 (citing Ford v.
Wainwright, 477 U.S. 399, 416-17, 106 S.Ct. 2595, 2605 (1986)).
Under North Carolina law, consistent with Atkins, "no defendant who
is mentally retarded shall be sentenced to death." N.C. Gen. Stat.

-16-

§ 15A-2005(b). Defendants bear the burden of establishing mental retardation by a preponderance of the evidence. Id. § 15A-2005(f).

The North Carolina state legislature has defined mental retardation as "[s]ignificantly subaverage general intellectual functioning, existing concurrently with significant limitations in adaptive functioning, both of which were manifested before the age of 18." Id. § 15A-2005(a)(1)(a). "Significantly subaverage general intellectual functioning" means "[a]n intelligence quotient ["IQ"] of 70 or below." Id. § 15A-2005(a)(1)(c). "Significant limitations in adaptive functioning" means "[s]ignificant limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure skills and work skills." Id. § 15A-2005(a)(1)(b).

> The defendant has the burden of proving significantly subaverage general intellectual functioning, significant limitations in adaptive functioning, and that mental retardation was manifested before the age of 18. An intelligence quotient of 70 or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist is evidence of significantly subaverage general intellectual functioning; however, it is not sufficient, without evidence of significant limitations in adaptive functioning and without evidence of manifestation before the age of 18, to establish that the defendant is mentally retarded.

Id. § 15A-2005(a)(2).

In this case, the state court conducted an extensive evidentiary hearing concerning petitioner's mental retardation claim, during which several experts and petitioner's sister testified and various reports and records were presented. The

-17-

court considered and gave a detailed summary of all evidence introduced during the hearing and concluded that petitioner failed to establish by a preponderance of the evidence both a significantly sub-average general intellectual functioning ability and the requisite number of significant adaptive functioning limitations. (Docket No. 27, Resp't Br., Attach. 4, Mental Retardation Order at 19).

Petitioner was administered two versions of the Wechsler Adult Intelligence Scale ("WAIS") IQ test, the WAIS-R and the WAIS-III, between December 2001 and October 2002. Given the ranges of competence/error, the scores of both tests could have been either above or below 70; petitioner scored a 69 on the WAIS-R and a 74 on the WAIS-III. Rather than simply basing its decision on the average score of 71.5, the court gave greater weight to the more current WAIS-III test. The court noted that the WAIS-R test was outdated, that there was conflicting testimony concerning whether petitioner gave his best efforts, and that petitioner scored well above 70 on three beta screening tests for IQ while previously incarcerated. (Id. at 15). While the court's analysis could have ended following its finding of adequate intellectual functioning ability, it further discussed petitioner's adaptive functioning. Based on the evidence, which partially included results from the Street Survival Skills Questionnaire ("SSSQ") test, the court found that the sole adaptive functioning limitation was that of functional academics, which is insufficient to support a finding of mental retardation. (Id. at 16-19).

-18-

Petitioner argues that the state court: (1) gave short shrift to testimony concerning the "practice effect," whereby a subsequent IQ test score will be higher if administered within a short period of time following the preceding test; (2) improperly discounted the fact that, given the ranges of competence/error, both WAIS test scores could have been 70 or below; (3) improperly considered trial testimony that did not involve petitioner's intelligence or adaptive functioning; (4) erroneously discounted evidence concerning additional adaptive functioning limitations; and (5) improperly ignored the views of professional associations that believe mental retardation may be diagnosed in persons with IQ test scores as high as 75. (Docket No. 21, Pet'r Supplemental Br.). Petitioner requests the expansion of the record to include the results of a new Stanford-Binet, Fifth Edition ("SB5") IQ test with supporting expert affidavits and a North Carolina Superior Court decision that discounts the reliability of the SSSQ test to determine adaptive functioning. (Docket No. 22, Pet'r Mot. to Expand R.).

First, the state court's ruling in this case is neither contrary to, nor an unreasonable application of, established Supreme Court precedent and its factual findings have not been rebutted by clear and convincing evidence. The state court conducted a thorough hearing concerning petitioner's mental retardation claim and its decision was based on and supported by adequate, competent evidence. The <u>Atkins</u> Court specifically left it to the states to develop procedures to determine the existence

-19-

of mental retardation and the state court strictly adhered to the applicable law in this case. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>McGuire</u>, 502 U.S. at 67-68, 112 S.Ct. at 480). Accordingly, Claim II should be denied.

Second, petitioner's motion to expand the record is denied. New IQ testing can continue <u>ad</u> <u>infinitum</u>, but does not necessarily improve accuracy of the results. In fact, subsequent testing will likely be less accurate when the result necessary to prove a claim is readily known to the person taking the test and the person interpreting the test; especially when varying interpretations and opinions can easily be obtained. The superior court decision on the SSSQ test is not relevant because it is merely one opinion and not that of the North Carolina Supreme Court. Moreover, because petitioner was not found to have significant sub-average general intellectual functioning ability, the proffered North Carolina Superior Court decision concerning the reliability of the SSSQ test in the determination of adaptive functioning is inconsequential.

**C.  Claim VI**

In Claim VI, petitioner contends that trial counsel provided constitutionally ineffective assistance during the closing argument of the sentencing phase of trial by "forcefully insulting the jury, accusing them of being bloodthirsty and goading them to impose a sentence of death." (Docket No. 8, Habeas Pet./Br. at 49). Petitioner raised this claim in his June 1998 MAR and it was found to be both procedurally barred and without substantive merit. The

State has expressly waived the N.C. Gen. Stat. § 15-1419(a)(3) procedural default defense as to this claim. (Docket No. 27, Resp't Br., Attach. 3, MAR Order at 22-25). See Gray v. Netherland, 518 U.S. 152, 166, 116 S.Ct. 2074, 2082 (1996) (failure to raise procedural default in federal habeas court means that the defense is lost).

"It has long been recognized that the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771, n.14, 90 S.Ct. 1441, 1449 n.14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064 (1984). To establish an ineffective assistance of counsel claim, a "[petitioner] must show that counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms." Id. at 688, 104 S.Ct. at 2065. A claim that counsel's assistance was so defective as to require habeas relief from a conviction or death sentence has two components:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result was not reliable.

Id. at 687, 104 S.Ct. at 2064.

-21-

In determining whether counsel's performance was deficient, "[i]t is all too tempting for a [petitioner] to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689, 104 S.Ct. at 2065. Therefore, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range a reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal quotation marks omitted).

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. at 2068. "Indeed, it is insufficient to show only that the errors had some conceivable effect on the outcome of the proceeding, because virtually every act or omission of counsel would meet this test." Williams, 529 U.S. at 394, 120 S.Ct. at 1514; see also Strickland, 466 U.S. at 693, 104 S.Ct. at 2067-68. "The petitioner bears the 'highly demanding' and 'heavy burden' in establishing actual prejudice." Williams, 529 U.S. at 394, 120 S.Ct. at 1514.

In the context of a capital sentencing proceeding, a demonstration of prejudice requires a showing that "there is a reasonable probability that, absent [trial counsel's objectively

-22-

unreasonable performance], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." <u>Strickland</u>, 466 U.S. at 695, 104 S.Ct. at 2069. To make such a showing, a petitioner need not establish a reasonable probability that the entire jury would have voted against the imposition of the death sentence, rather that "there is a reasonable probability that at least one juror would have struck a different balance." <u>Wiggins v. Smith</u>, 539 U.S. 510, 537, 123 S.Ct. 2527, 2543 (2003).

Each of petitioner's counsel made closing arguments during the sentencing phase of trial. Attorney Horton first described to the jury the legal standards and process of sentencing in relation to the evidence before them. (Trial Tr. at 1317-29). Attorney Clary, whose argument forms the basis of this claim, followed and discussed the emotional aspects of the case. He argued in relevant part as follows:

> Well, I know, look at that time. Late in the afternoon. I know that y'all are really itching to get back there so you can be the machine of death. That is what the State wants you to be.
>
> These are two of the best trial lawyers in the state and they got you foaming back there. They want you to run back there and vote for death. Even got some of the staff sitting back here like lions waiting for the antelope. They smell blood. That's what this is about. They want death. They want you to give him death. You can't wait to get back there. That's what they hope.
>
> . . .
>
> So when you get home tonight and you see Bobby and Sally and Susan and your kids say, mommy and daddy, what did you do today? So you can tell him, well, I voted to kill Thomas Larry.

-23-

Or maybe you can say I voted to spare his life.

That's all.

(<u>Id</u>. at 1330-32).

Petitioner contends that the tone, content, and brevity of Attorney Clary's argument made it "clearly unreasonable and prejudicial." He argues that "[t]he only possible effect of this argument to a death-qualified jury would be to irritate, insult, and inflame," and actually "goad[] them to impose a sentence of death." (Docket No. 8, Habeas Pet./Br. at 49-50). The MAR court disagreed, finding Attorney Clary's closing argument to be "impassioned and effective" and part of a reasoned strategic plan. (Docket No. 27, Resp't Br., Attach. 3, MAR Order at 23-24).

This claim borders on being frivolous; petitioner either misunderstands or misrepresents the purpose of the closing argument at issue. Attorney Clary does not concede futility and lash out at the jury in frustration and actually encourage them to sentence petitioner to death. Rather, he made a strategic decision to deliver an "impassioned and fervent" argument designed to jolt the jury out of potential complacency and emphatically remind them of the gravity of the decision they faced. That strategy, which was clearly reasonable and potentially very effective, will not be second-guessed by this Court. The MAR court's decision denying petitioner's Sixth Amendment claim was neither contrary to, nor an unreasonable application of, established Supreme Court precedent. Accordingly, Claim VI should be denied.

**D.   Claim VIII**

Petitioner contends in Claim VIII that his rights to due process and a reliable sentencing hearing were violated by the trial court's sentencing instruction requiring unanimity for rejection of the death penalty.  This claim was considered and denied by the North Carolina Supreme Court on direct appeal. Larry, 345 N.C. at 532-33; 481 S.E.2d at 927-28.

Petitioner argues that the jury instruction at issue in this case involves an unreasonable application of McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227 (1990), and Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546 (1988).  The Court disagrees. A general discussion of the controlling legal principles will be helpful before examining the claim in detail.

First, it is unconstitutional to preclude the jury from considering and giving effect to evidence of any relevant mitigating circumstance proffered by the defendant.  McKoy, 494 U.S. at 442, 110 S.Ct. at 1233.  In McKoy, the Court struck down a North Carolina practice that required a capital sentencing jury to unanimously find the existence of mitigating circumstances before giving them any weight.  Id. at 442-44, 110 S.Ct. at 1233-34 (following Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860 (1988)). The Court noted that "it would be the 'height of arbitrariness to allow or require the imposition of the death penalty' where 1 juror was able to prevent the other 11 from giving effect to mitigating evidence."  Id. at 440, 110 S.Ct. at 1232 (quoting Mills, 486 U.S. at 374, 108 S.Ct. at 1865).   In determining whether jury

-25-

instructions violate <u>McKoy</u>, the question is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. <u>Boyde v. California</u>, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198 (1990).

Second, "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." <u>Lowenfield</u>, 484 U.S. at 241, 108 S.Ct. at 552. In <u>Lowenfield</u>, the United States Supreme Court held that a state trial court did not unconstitutionally coerce the jury when it both inquired as to how many jury members believed further deliberations would be useful and gave the jury supplemental instructions. <u>Id</u>. The Court noted that "[t]he very object of the jury system is to secure unanimity by a comparison of views" and recognized a court's authority to encourage further deliberation, even in capital cases. <u>Id</u>. at 237-38, 108 S.Ct. at 550-51 (internal citation omitted).

During the sentencing phase of trial, members of a capital jury in North Carolina are asked if they: (1) unanimously find the existence of one or more aggravating circumstances beyond a reasonable doubt (Issue One); and (2) individually find the existence of one or more mitigating circumstances by a preponderance of the evidence (Issue Two). (Trial Tr. at 1347, 1349, 1356; Docket No. 15, Answer, Attach., Issues and Recommendation as to Punishment at 1-5). If the jury answers "YES" to Issues One and Two, they are next asked if they "unanimously

-26-

find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found" (Issue Three). (Trial Tr. at 1347, 1373; Docket No. 15, Answer, Attach., Issues and Recommendation as to Punishment at 5-6).

The trial court instructed the jury regarding Issue Three as follows:

> If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances. When deciding this third issue, each juror may consider any mitigating circumstance or circumstances that that juror determined to exist by a preponderance of the evidence in issue two. In so doing, each juror is the sole judge of the weight to be given to any individual circumstance which the juror finds whether aggravating or mitigating.

> You should not merely add up the number of aggravating circumstances and mitigating circumstances. Rather, you must decide from all the evidence what value to give each circumstance and then weigh the aggravating circumstances so valued against the mitigating circumstances so valued, and finally determine whether the mitigating circumstances are insufficient to outweigh the aggravating circumstances.

> If you unanimously find beyond a reasonable doubt that the mitigating circumstances found are insufficient to outweigh the aggravating circumstances found, you would answer issue three yes. If you do not so find or have a reasonable doubt as to whether they did, you would answer issue three no.

> If you answer issue three no, it would be your duty to recommend that the defendant be sentenced to life imprisonment. If you answer issue three yes, you must consider issue number four.

(Trial Tr. 1373-74).

The jury submitted the following questions to the trial court during deliberations: "In issue number three, does it have to be

-27-

unanimously yes or unanimously no?  And if not, what's our next step?  Wording is not clear." (Id. at 1399).  Petitioner's counsel argued that the response should be that unanimity was required for an affirmative answer only and that a life sentence should be imposed if the jury is unable to reach a unanimous decision.  (Id. at 1403-04).  Based on the North Carolina constitutional and statutory requirements that all jury verdicts be unanimous, the court disagreed and instructed the jury as follows:

> THE COURT:  The answer to your question about unanimity is that the jury must answer either yes or no according to the instructions and the evidence on a unanimous basis.  So, whatever answer is given would be a unanimous verdict on the issue.  I believe that will answer your first part.  The answer is it does have to be unanimous.
>
> . . .
>
> JUROR 12:  The answer you have given us is that we must have a unanimous yes or unanimous no.
>
> THE COURT:  That's correct.  The statute and the law require your recommendation must be unanimous and that other than the mitigating circumstances which need not be found unanimously, the verdicts must - - and the answers must be unanimous.  There is no requirement of unanimity on mitigating circumstances.

(Id. at 1407-08).

The jury foreman acknowledged the jury's understanding that unanimity is not required to find the existence of mitigating circumstances.  (Id. at 1407).  Another jury member then inquired about a potential deadlock as to Issue Three and the judge responded as follows:

> THE COURT:  All right.  I wasn't sure whether that was the question or not, but it appears to be at this time.  Members of the jury, your inability to reach a

-28-

unanimous decision as to an issue or recommendation as to punishment should not be your concern but should simply be reported to the Court. The Court will instruct you further that it's your duty to do - - to consult with one another and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment.

Each of you must decide the case for yourself and the issues for yourself as a juror, but only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, each of you should not hesitate to re-examine your own views and change your opinion if it's erroneous. However, none of you should surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning an answer to an issue or recommendation as to punishment.

(Id. at 1408-09).

On direct appeal, the North Carolina Supreme Court summarily denied petitioner's claim based on its earlier decision in State v. McCarver, 341 N.C. 364, 462 S.E.2d 25 (1995). Larry, 345 N.C. at 533, 481 S.E.2d at 928. In McCarver, the North Carolina Supreme Court found no error in a trial court's jury instruction that the answer to Issue Three must be unanimous regardless of whether the answer is "yes" or "no." 341 N.C. at 389-90, 462 S.E.2d at 39. The court held "that any issue which is outcome determinative as to the sentence a defendant in a capital trial will receive . . . must be answered unanimously by the jury. That is, the jury should answer Issues One, Three, and Four on the standard form in capital cases either unanimously 'yes' or unanimously 'no.'" Id. (emphasis omitted). Furthermore, the court noted the North Carolina constitutional and statutory requirements that "any jury recommendation requiring a sentence of death or life imprisonment

-29-

must be unanimous" and reasoned that the unanimity requirement both ensures "real and full deliberation" and prevents a jury from evading its duty to make a sentencing recommendation. <u>Id</u>.

The denial of this claim by the North Carolina Supreme Court is neither contrary to, nor an unreasonable application of, <u>McKoy</u> or <u>Lowenfield</u>. The jury was in no way precluded from considering or giving effect to any mitigating circumstances in violation of <u>McKoy</u>. In fact, the trial court made it abundantly clear to the jury, and the jury acknowledged its understanding, that unanimity was not required as to the finding of mitigating circumstances. (Trial Tr. at 1373-74, 1407-08). Rather, the unanimity requirement concerned only the weighing process. The trial court instructed the jury that while weighing the aggravating and mitigating circumstances, each juror "may consider any mitigating circumstance or circumstances that the juror determined to exist . . . [and] is the sole judge of the weight to be given to any individual circumstance the juror finds . . . ." (<u>Id</u>. at 1373-74). There is simply no reasonable likelihood that the jury applied the challenged instruction in a way that prevented the consideration of any constitutionally relevant evidence. <u>See</u> <u>Boyde</u>, 494 U.S. at 380, 110 S.Ct. at 1198. Furthermore, the jury's verdict was in no way the product of coercion in violation of <u>Lowenfield</u>. The trial court instructed the jury that any inability to agree should be reported to the court and that no juror should surrender any strongly-held conviction for the sake of unanimity. (Trial Tr.

1408-09). Claim VIII is without merit and should, therefore, be denied.

## E. Claim XI

In Claim XI, petitioner contends that his rights to due process and a reliable sentencing determination were violated by the prosecution's improper and prejudicial remarks to the jury during closing arguments of the sentencing phase of trial. This claim consists of two sub-claims, one concerning comments about petitioner's character and the other concerning speculation about possible release and future dangerousness. Each sub-claim was considered and denied by the North Carolina Supreme Court on direct review. Larry, 345 N.C. at 526-27, 481 S.E.2d at 924-26.

The Fourth Circuit has recognized that prosecutors are afforded wide latitude in presenting arguments to a jury. Bates v. Lee, 308 F.3d 411, 422 (4th Cir. 2002). "[T]he adversary system permits the prosecution to 'prosecute with earnestness and vigor.'" United States v. Young, 407 U.S. 1, 7, 105 S.Ct. 1038, 1042 (1985) (quoting Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633 (1935)). "Committed advocates do not always make antiseptic closing statements, and the jury is entrusted within reason to resolve such heated clashes of competing views." Bates, 308 F.3d at 422.

Misconduct by a prosecutor in closing argument may be grounds for habeas relief; however, the fact that comments are "undesirable or even universally condemned" is not sufficient. Arnold v. Evatt, 113 F.3d 1352, 1358 (4th Cir. 1997) (quoting Darden v. Wainwright,

477 U.S. 168, 181, 106 S.Ct. 2464, 2471-72 (1986)). To prevail on a claim of prosecutorial misconduct, it must be shown that an improper action or comment by the prosecutor "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, 477 U.S. at 181, 106 S.Ct. at 2471 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974)). "In determining whether a prosecutor's comments denied the defendant fundamental fairness, the reviewing court should consider: (1) the nature of the comments, (2) the nature and quantum of the evidence before the jury, (3) the arguments of opposing counsel, (4) the judge's charge, and (5) whether the errors were isolated or repeated." Arnold, 113 F.3d at 1358.

In this case, the prosecution made an impassioned closing argument during the sentencing phase of trial advocating petitioner's death based on his character and criminal history. While discussing petitioner's previous crimes, the prosecutor argued that petitioner did not "give a damn" about any of his many victims and encouraged the jury to reciprocate that sentiment. (Trial Tr. at 1279). The prosecution compared petitioner to a "weasel" because he plays trick or treat, grabs the money, and runs away. (Id. at 1280). He characterized petitioner as a "coward" for victimizing vulnerable, unarmed people at gunpoint and running away, and as a "good for nothing mammal" that comes from the "bottom of the barrel." (Id. at 1283, 1296, 1308).

-32-

The prosecution further discussed the potential implications of petitioner not receiving the death penalty as follows:

> You got two choices. You can passively sit here and tolerate this nonsense to go on and on and on, or you can be a hero like Robert Buitrago. You can step up and finally do something about it. Those are your two choices. And if you don't do something about it, any future victim's blood is on you. Any future victim could come to you and ask you why you didn't do something when you had the chance. And any of the past victims can come to you and ask you why their suffering wasn't enough for you to do something in this case.[7]

(<u>Id</u>. at 1277).

> You know, but we put him in jail for 25 years back in 1975, that didn't stop him. He got out after 11. Within six months, he committed another crime. Went back to jail for ten years, they kept him for three. That didn't stop him.
>
> The only thing that is going to stop him, members of the jury, I submit to you, is your sentence of death. That's the only thing that's going to stop him. . . .

(<u>Id</u>. at 1310).

> Members of the jury, the only way you can be sure [that petitioner will not be released] is to vote for the death penalty in this case.

(<u>Id</u>. at 1315).

On direct review, the North Carolina Supreme Court noted that a defendant's character may be considered by the jury during the sentencing phase of trial and found that the prosecution's character arguments in this case were not improper.[8] <u>Larry</u>, 345

---

[7] Defense counsel objected three times during this argument and each objection was sustained.

[8] The North Carolina Supreme Court did not address, and petitioner did not raise, the specific character language objected to in this claim on direct appeal. The court did, however, perform "a careful review of the transcript." (continued...)

-33-

N.C. at 529, 481 S.E.2d at 925-26. The prosecution's arguments concerning the possibility of parole consisted of a statement concerning future victims and a discussion of petitioner's previous crimes and the amount of time he served before being released. The North Carolina Supreme Court found the statement concerning future victims to be harmless in light of the defense's sustained objections. Id. at 527, 481 S.E.2d at 924. The court found that the remaining arguments "did not constitute impermissible injection of the possibility of parole into the sentencing deliberations"; rather, "the arguments focused on the importance of the jury's duty and suggested that the death penalty would specifically deter defendant from committing future crimes, both permissible lines of argument by the prosecution." Id. at 528, 481 S.E.2d at 925 (internal citations omitted).

Starting first with the name calling sub-claim, the prosecution made reference to petitioner's low character in light of his past behavior and criminal record by calling him a "weasel," "coward," and a "good for nothing mammal" that comes from the "bottom of the barrel." This name calling cannot be said to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." See Donnelly, 416 U.S. at 643, 94 S.Ct. at 1871. These four isolated words/phrases out of approximately forty pages of closing arguments amount to nothing more than petty name calling based on petitioner's past behavior

---

[8](...continued)
Larry, 345 N.C. at 528, 481 S.E.2d at 925.

and do not come close to the extreme level necessary to be considered prejudicial. In fact, arguments based on pure name calling, especially when isolated, may be less effective and serve to detract from the overall message being conveyed.

A review of the prosecution's entire argument shows that it concentrated on pointing out that petitioner had little or no remorse except for being caught, that petitioner had an extensive record of similar behavior, and emphasized the strong evidence supporting the other aggravating factors. The prosecutor also discussed the mitigating factors extensively and why petitioner's mental, family, or other problems were not worthy of being considered as mitigating for purposes of avoiding the death penalty. Thus, the isolated name calling was truly overwhelmed by this other pertinent hard-hitting argument. Furthermore, the evidence of guilt and evidence supporting each aggravating circumstance found by the jury was extremely strong and the trial court properly instructed the jury to base its decision on the evidence presented. The sub-claim concerning the prosecution's character arguments is, therefore, without merit and should be denied. The state court's finding of no error was not contrary to or an unreasonable application of established federal law.

With respect to the parole sub-claim, petitioner would have been eligible for it after twenty years if sentenced to life

imprisonment.[9]  See State v. Connor, 345 N.C. 319, 330-32, 480 S.E.2d 626, 631 (1997).  While there was a possibility of parole, state law deemed such argument irrelevant during sentencing determinations.  See State v. Bacon, 337 N.C. 66, 98, 446 S.E.2d 542, 558 (1993); State v. Jones, 296 N.C. 495, 500, 251 S.E.2d 425, 428 (1979).  Federal law, however, does not mandate such a limitation.  California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983)(noting State v. Jones, supra).  The decision of whether or not parole eligibility is disclosed to the jury is generally left to the states.  Roach v. Angelone, 176 F.3d 210, 220 (1999).  "'In a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact.'"  Id. (quoting Simmons v. South Carolina, 512 U.S. 154, 176, 114 S.Ct. 2187, 2200 (1994)).  Further, it is clearly established that future dangerousness is a relevant and appropriate consideration for the jury during capital sentencing.  Simmons, 512 U.S. at 162, 114 S.Ct. at 2193 (citing Jurek v. Texas, 428 U.S. 262, 275, 96 S.Ct. 2950, 2958 (1976), and California v. Ramos, 463 U.S. 992, 1003 n.17, 103 S.Ct. 3446, 3454 n.17 (1983)).  Because petitioner's sub-claim concerning the speculation about his possible release from prison does not implicate federal law, it is not cognizable on habeas review.  McGuire, 502 U.S. at 67-68, 112 S.Ct. at 480 ("[I]t is not the province of a federal habeas court

_____

[9]  In 1994, the North Carolina legislature amended the law to provide that a defendant sentenced to life imprisonment for first-degree murder committed after October 1, 1994 shall not be eligible for parole.  N.C. Gen. Stat. § 15A-2002.  Petitioner murdered Robert Buitrago on January 15, 1994.

-36-

to reexamine state-court determinations on state-law questions."); <u>Cooper</u>, 103 F.3d at 370 (stating that federal habeas review is limited to "violations of the United States Constitution or its laws and treaties"); <u>Kornahrens</u>, 66 F.3d at 1357 ("[B]asic principles of federalism permit us to review only those state-court decisions that implicate federal constitutional rights.").

Accordingly, Claim XI should be denied.

**F.   Claim XII**

In Claim XII, petitioner contends that his rights to due process and a reliable sentencing hearing were violated by the jury's consideration of evidence outside the record weighing in favor of death. Based on an affidavit from one of the jurors, petitioner asserts that the jury improperly considered information that was outside the record developed at trial by speculating on the possibility of petitioner being released from prison in the future. Petitioner raised this claim in an amendment to his first MAR. The MAR court found the claim to be without merit without conducting an evidentiary hearing. (Docket No. 27, Resp't Br., Attach. 3, MAR Order at 46-48).

The Sixth Amendment provides that "the accused shall enjoy the right to a . . . trial[] by an impartial jury . . . [and to] be confronted with the witnesses against him." U.S. Const. amend. VI. The right to trial by jury "guarantees . . . a fair trial by a panel of impartial, indifferent jurors. A fair trial in a fair tribunal is a basic requirement of due process." <u>Irvin v. Dowd</u>, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642 (1961) (internal quotations

-37-

and citations omitted).  The right requires that the "jury's verdict must be based upon the evidence developed at trial," and "necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of defendant's right[s]."  <u>Turner v. Louisiana</u>, 379 U.S. 466, 472-73, 85 S.Ct. 546, 549-50 (1965) (internal quotations and citations omitted).  These constitutional protections apply equally to capital sentencing proceedings.  See <u>Morgan v. Illinois</u>, 504 U.S. 719, 727-28, 112 S.Ct. 2222, 2229 (1992).

"Despite these venerable protections afforded to criminal defendants, the Sixth Amendment does not require that all evidence introduced by the defendant tending to impeach the jury's verdict be considered by the courts."  <u>Robinson v. Polk</u>, 438 F.3d 350, 359 (4th Cir. 2006) (citing <u>Tanner v. United States</u>, 483 U.S. 107, 117, 107 S.Ct. 2739, 2745-46 (1987)).  Under North Carolina law, which was codified based on the general common law rule, "[u]pon an inquiry into the validity of a verdict, no evidence may be received to show the effect of any statement, conduct, event or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined . . . ."  N.C. Gen. Stat. § 15A-1240(a).  The North Carolina Rules of Evidence, which is identical to its federal counterpart, further provide that:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to

-38-

> assent to or dissent from the verdict or indictment or
> concerning his mental processes in connection therewith
> . . . . Nor may his affidavit or evidence of any
> statement by him concerning a matter about which he would
> be precluded from testifying be received for these
> purposes.

N.C. Gen. Stat. § 8C-1, Rule 606(b); see also Fed. R. Evid. 606(b).
An exception to this rule is when "extraneous prejudicial
information [is] improperly brought to the jury's attention.[10] Id.
Extraneous prejudicial information is "information that was not
admitted into evidence but nevertheless bears on a fact at issue in
the case." Robinson, 438 F.3d at 360 (citing Parker v. Gladden,
385 U.S. 363 (1966), and Turner v. Louisiana, 379 U.S. 466 (1965));
see also State v. Heatwole, 344 N.C. 1, 12, 473 S.E.2d 310, 315
(1996) (defining extraneous prejudicial information as "information
that reaches a juror without being introduced into evidence and
that deals specifically with the defendant or the case being
tried").

Petitioner contends, based on an affidavit of Juror Stephen K.
Way, that the jury relied on improper information in reaching its
verdict. In his sworn affidavit, Juror Way states that the jury
was aware of petitioner's early release from his previous
convictions, that he and other jury members believed that a life
sentence meant that petitioner would be out of prison "in a few
years," and that he and other jury members voted for the death
penalty based on that belief rather than "the aggravating

---

[10] Another exception to the rule, which is not applicable in this case,
is when "any outside influence [is] improperly brought to bear upon any juror."
N.C. Gen. Stat. § 8C-1, Rule 606(b).

circumstances outweigh[ing] the mitigating circumstances." (Docket No. 8, Habeas Pet./Br., Ex. 23, Aff. of Steven K. Way).

During sentencing deliberations, the jury inquired about the possibility of potential release and were instructed by the trial judge to limit their consideration to the instructions given. (Trial Tr. at 1390). The trial judge informed the jury that it was their "duty in considering whether to recommend death or life imprisonment that [they] should determine the question as though life imprisonment means exactly what the statute says, imprisonment for life in the state's prison," and each juror acknowledged his or her understanding of and ability to follow that duty. (Id. at 1390). Petitioner contends that Juror Way ignored this instruction and his promise to adhere to it. He also wants the Court to infer that others did so as well based on the approximate eight-hour deliberation where the jury had "difficulty reaching a unanimous decision." Petitioner contends that this wholly speculative correlation corroborates Juror Way's affidavit and mandates relief.

The MAR court, however, refused to consider Juror Way's affidavit and found petitioner's claim to be without merit. (Docket No. 27, Resp't Br., Attach. 3, MAR Order at 46-48). The MAR court ruled, based on the statutory provisions discussed above, that the affidavit was inadmissible because it "only contain[ed] statements relating to Mr. Way's mental processes in connection with the verdict . . . and matters occurring during the course of deliberations," and that "[n]othing in Mr. Way's affidavit relates that [] external prejudicial information was considered by the

-40-

jury. . . ." (Docket No. 27, Resp't Br., Attach. 3, MAR Order at 47). The evidence clearly supports that determination.

Second, petitioner's argument would require a change in the law. The sole task before the jury during the sentencing phase of trial was to determine the existence of various aggravating and mitigating circumstances and to weigh any aggravating and mitigating circumstances that were found to exist. See N.C. Gen. Stat. § 15A-2000(b). A juror's erroneous belief concerning the actual duration of a life sentence under North Carolina law neither bears on a fact at issue in the case being tried nor specifically deals with petitioner. See Robinson, 438 F.3d at 360; Heatwole, 344 N.C. at 12, 473 S.E.2d at 315; see also Silagy v. Peters, 905 F.2d 986, 1008-09 (7th Cir. 1990) (holding that a juror's erroneous statements to other jurors that a life sentence actually meant "no more than five to seven years" was inadmissible under Rule 606(b) and did not warrant habeas relief). There is simply no clearly established Supreme Court precedent that mandates habeas relief when jurors misunderstand and/or misstate the law of parole to other jurors during deliberation or that requires a state court to admit juror testimony concerning internal discussions about potential early release during deliberations. See Salazar v. Dretke, 419 F.3d 384, 399 (5th Cir. 2005). The MAR courts denial of petitioner's claim was neither contrary to, nor an unreasonable application of, established Supreme Court precedent. Accordingly, Claim XII should be denied.

### G.  Claim XIII

Petitioner contends in Claim XIII that his rights to due process and a reliable sentencing determination were violated by the prosecution's questions/remarks during the sentencing phase of trial concerning his exercise of constitutional rights.  Petitioner specifically argues that the prosecution improperly questioned him concerning an Alford plea to a previous crime and his right to counsel, and made improper comments concerning his rights to remain silent and to have a jury trial.  This claim was considered and denied on direct appeal by the North Carolina Supreme Court. Larry, 345 N.C. at 523-25, 481 S.E.2d at 922-24.

As discussed above in Claim XI, habeas courts review claims of prosecutorial misconduct to determine whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643, 94 S.Ct. at 1871.  In conjunction therewith, the federal Constitution "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Griffin v. California, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233 (1965).  This prohibition applies equally to the sentencing phase of trial as it does to the guilt phase.  Mitchell v. United States, 526 U.S. 314, 327-30, 119 S.Ct. 1307, 1314-16 (1999).  Improper comment on the defendant's failure to testify occurs when "the language used [is] manifestly intended to be, or . . . [is] of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused

-42-

to testify." <u>United States v. Anderson</u>, 481 F.2d 685, 701 (4th Cir. 1973).

In this case, while petitioner did not testify during the guilt phase of trial, he took the stand during the sentencing phase and testified that he never intended to hurt anyone. (Trial Tr. at 1173). The prosecutor made comments about petitioner looking at his attorneys during the cross-examination and the court responded that petitioner was not required to look at the questioning attorney. (<u>Id</u>. at 1194, 1200). The jury, nevertheless, had a right to consider all of petitioner's behavior while on the witness stand.

The prosecutor also asked questions concerning an <u>Alford</u> plea made in a previous case and petitioner testified that he was merely following counsel's advice. (<u>Id</u>. at 1182-84). The prosecutor responded by asking petitioner if his current counsel instructed him that the only way to save his life was to take the stand "and cry a little bit," which was objected to and sustained. (<u>Id</u>. at 1183-84). The North Carolina Supreme Court found that petitioner was not prejudiced by the prosecution's cross-examination during the sentencing phase of trial concerning his previous <u>Alford</u> plea and his right to counsel. <u>Larry</u>, 345 N.C. at 523-24, 481 S.E.2d at 922.

Of more substantial concern, the closing arguments of the sentencing phase of trial, the prosecutor argued in relevant part as follows:

Now, there's one other time that you can hear about his past, too. And that's if he takes the stand. He can be cross-examined about all of those other prior convictions. But in this case, the defendant elected not to testify during the guilt or innocence phase. And he has a constitutional right to do that.

But you ask yourself this question: Why did he do that?

[Objection overruled.]

Anyway, he testified yesterday that he wanted you to know the whole truth. You decide whether or not that was his motivation or not. I submit to you that wasn't his motivation. Whether or not you knew the truth was the [furthest] thing from his mind. He had nothing to lose yesterday. You folks had already found him guilty. He had nothing to lose except get up there and try and convince you that he was remorseful about this crime.

. . .

What wrongdoing did he admit with respect to shooting Robert Buitrago? What did he tell his psychologist? The gun just went off. He didn't admit to any kind of murder in this case. He admitted to murder, he'd pled guilty, I assume.

[Objection overruled.]

But he didn't do that.

(Id. at 1296-97, 1305).

The North Carolina Supreme Court assumed arguendo that the remarks were improper, but concluded that they were harmless beyond a reasonable doubt. Id. at 524-25, 481 S.E.2d at 922-23. The court acknowledged the possibility that the prosecution's remark concerning petitioner's decision not to plead guilty could have

-44-

persuaded one or more jurors not to find the existence of the acceptance of responsibility mitigating circumstance. Id. at 524, 481 S.E.2d at 924. Nevertheless, the court concluded that:

> overwhelming evidence supports the five aggravating circumstances found by the jury. When we consider these aggravating circumstances in light of the mitigating circumstances found by the jury, as well as the mitigating circumstance not found by the jury that defendant had acknowledged wrongdoing, we are convinced that the weighing process was not compromised.

Id.

The prosecution's comment that petitioner "elected not to testify during the guilt or innocense phase" and subsequent rhetorical question of "[w]hy did he do that?" were "of such a character that the jury would naturally and necessarily take it to be a comment on" petitioner's right to remain silent in violation of Griffin and its progeny. In addition, as found by the North Carolina Supreme Court, the prosecution's remark that petitioner would have pled guilty if he truly acknowledged his wrongdoing could have persuaded one or more jurors not to find that mitigating circumstance. However, principles of comity and respect for state court judgments preclude habeas relief unless the state court error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)). In applying Brecht, habeas relief must be granted if "grave doubt" exists as to the harmlessness of the error. Fullwood v. Lee, 290 F.3d 663, 679 (4th

-45-

Cir. 2002) (citing <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436, 115 S.Ct. 992, 995 (1995)). "'Grave doubt' exists when, in light of the entire record, the matter is so evenly balanced that the court feels itself in 'virtual equipose' regarding the error's harmlessness." <u>Id</u>.

While petitioner's right not to testify may have been implicated, it was an isolated comment made during the sentencing phase of trial that was qualified by an acknowledgment of petitioner's constitutional right to do so. Likewise, the prosecution's reference to petitioner's choice to be tried by a jury of his peers was isolated and made during the sentencing phase of trial in response to the submitted mitigating circumstance that he accepted responsibility for his crime. These comments, however, must be kept in the perspective that it was petitioner who raised the issue that he wanted the jury to know the whole truth and convince the jury he was remorseful. (Trial Tr. at 1172, 1176) It was in that context that the prosecutor pointed out that not only did petitioner not truly and fully acknowledge his guilt, but also waited to make his plea to the jury until he was at a point where he had nothing to lose. Thus, the remarks were not irrelevant, but material concerning petitioner's true motivation and brought on by petitioner's own statements. In addition, as also found by the North Carolina Supreme Court, based on the overwhelming evidence in this case, there was no "substantial and injurious effect or influence" over the jury's verdict and there exists no "grave

-46-

doubt" as to the harmlessness of these errors. <u>Brecht</u>, 507 U.S. at 637, 113 S.Ct. at 1722.

The North Carolina Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly establish federal law. Accordingly, Claim XIII should be denied.

**H.   Claim XIV**

Petitioner contends in Claim XIV that his rights to due process and a reliable sentencing determination were violated by the jury's failure to find the non-statutory mitigating circumstances that he was reared by a single mother after being abandoned by his father and that he suffers from a mental disturbance that is genetic in origin. Petitioner argues that the jurors are required to believe and find these factors to be mitigating as a matter of law. He fails to cite any authority that the jury was required to be so instructed. This claim was considered and denied on direct appeal by the North Carolina Supreme Court. <u>Larry</u>, 345 N.C. at 532; 481 S.E.2d at 927.

The Eighth Amendment requires that a capital jury "not be precluded from considering, <u>as a mitigating factor</u>, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." <u>Lockett v. Ohio</u>, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65 (1978) (emphasis in original). "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, <u>as</u>

-47-

a matter of law, any relevant mitigating evidence." <u>Eddings v.</u>
<u>Oklahoma</u>, 455 U.S. 104, 113-14, 102 S.Ct. 869, 876-77 (1982)
(emphasis in original). The United States Supreme Court is "very
sensitive to any impediment to the consideration of any type of
mitigating evidence in a death sentencing hearing." <u>Hutchins v.</u>
<u>Garrison</u>, 724 F.2d 1425, 1437 (4th Cir. 1983); <u>see also</u> <u>Fullwood v.</u>
<u>Lee</u>, 290 F.3d 663, 692-93 (4th Cir. 2002). However, the
Constitution does not dictate the manner in which a jury must
consider mitigating evidence and what it must find, only that the
state may "not preclude the jury from giving effect to any such
evidence." <u>Buchanan v. Angelone</u>, 522 U.S. 269, 276, 118 S.Ct. 757,
761 (1998); <u>see also</u> <u>Zant v. Stephens</u>, 462 U.S. 862, 890, 103 S.Ct.
2733, 2750 (1983) ("[T]he Constitution does not require a state to
adopt specific standards for instructing a jury in its
consideration of aggravating and mitigating circumstances . . .
.").

Petitioner presented evidence during the sentencing phase of
trial that he was reared by his single, working mother after being
abandoned by his father at a young age and that he suffers from a
mental disturbance that is genetic in origin. (Trial Tr. at 1108-
27, 1155-58, 1169-70). Petitioner submitted these factors as non-
statutory mitigating circumstances. After conducting a sentencing
charge conference, the trial court instructed the jury on both of
the non-statutory mitigating circumstances at issue and informed
them that "[a]ll evidence tend[ed] to show" their existence. (<u>Id</u>.
at 1163, 1166). The trial court did not, however, instruct the

-48-

jury that these circumstances must be assigned mitigating value as a matter of law.

On direct appeal, the North Carolina Supreme Court distinguished between the constitutional requirement "that the sentencing jury be permitted to consider and give effect to mitigating evidence in recommending a sentence," Larry, 345 N.C. at 532, 481 S.E.2d at 927 (citing McKoy, 494 U.S. at 442-43, 110 S.Ct. at 1233 (1990), and Penry v. Lynaugh, 492 U.S. 302, 318-319, 109 S.Ct. 2934, 2947 (1989)), and the autonomy afforded states "'to adopt specific standards for instructing the jury in consideration of aggravating and mitigating circumstances." Id. (quoting Zant, 462 U.S. at 890, 103 S.Ct. at 2750). The court noted that "'the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer.'" Id. (quoting Harris v. Alabama, 513 U.S. 504, 511, 115 S.Ct. 1031, 1035 (1995)). The court, therefore, concluded that North Carolina's rule that non-statutory mitigating circumstances must be determined by the jury to both exist and have mitigating value "does not prevent the sentencing jury from considering or giving effect to any mitigating evidence in recommending a sentence." Id.

Petitioner contends that established United States Supreme Court precedent requires that jurors must find mitigating value in the circumstances at issue. Petitioner claims that Wiggins, Williams, and Eddings stand for the proposition that being raised by a single parent and childhood abandonment by one or both parents

-49-

is mitigating as a matter of law. He next cites to <u>Rompilla v.</u> <u>Beard</u>, 545 U.S. \_\_\_, 125 S.Ct. 2456 (2005), and <u>Williams</u> for the proposition that evidence of genetic mental disturbance is mitigating as a matter of law. None of these cases, however, mandate that a jury must find that such factors have and always have mitigating value. Rather, based on the particular facts and circumstances of each case, the Supreme Court merely determined that the particular circumstances need only be examined and considered.

In the instant case, the trial court neither precluded nor burdened the jury's consideration of the non-statutory mitigating circumstances that petitioner was reared by a single mother after being abandoned by his father and that he suffers from a mental disturbance that is genetic in origin. Both alleged mitigating circumstances were submitted to the jury with the trial court's finding of sufficient evidentiary support and adequately considered by the jury during sentencing deliberations. (Trial Tr. at 1163, 1166; Docket No. 15, Answer, Attach., Issues and Recommendation as to Punishment at 4). There is simply no constitutional requirement that, as a matter of law, every juror is required to find as having mitigating value the factors of living in a single parent household, being abandoned, or having a genetic mental disturbance upon the presentation of substantial evidence of the same. The North Carolina Supreme Court's decision was neither contrary to, nor an unreasonable application of, established Supreme Court precedent. Accordingly, Claim XIV should be denied.

## V. CONCLUSION

**IT IS THEREFORE RECOMMENDED** that the petition for a writ of habeas corpus (docket no. 8) be denied and that judgment be entered dismissing this action.

**IT IS ORDERED** that petitioner's motion to expand the record (docket no. 22) is denied.

_Russell A. Eliason_
**United States Magistrate Judge**


June 13, 2006